# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | * | |
| WEEKS MARINE, INC., | * | CIVIL ACTION NO. 14-905 |
| | * | |
| v. | * | SECTION |
| | * | |
| BAE SYSTEMS SOUTHEAST SHIPYARDS | * | |
| ALABAMA LLC | * | |
| | * | |
| | * | |

## VERIFIED COMPLAINT
## SEEKING INJUNCTIVE RELIEF IN AID OF ARBITRATION

Weeks Marine, Inc. ("WMI" or "Plaintiff"), by and through its undersigned counsel, hereby brings the following Verified Complaint against Defendant BAE Systems Southeast Shipyards Alabama, LLC ("BAE" or "Defendant") seeking injunctive relief in aid of arbitration.

## NATURE OF THE ACTION

1.     By this action, Plaintiff WMI seeks injunctive relief in aid of arbitration for purposes of protecting and enforcing its rights pursuant to a shipbuilding contract dated August 5, 2011 (the "Contract") entered into with BAE for the construction of a self-propelled trailing suction hopper dredge (the "Ship").  A true and correct copy of the Contract is attached as Exhibit "A" to the Affidavit of Stephen J. Chatry ("Chatry Affidavit"), which is attached hereto as Exhibit 1.

2.     The Contract required the Ship to be completed by February 5, 2014, a date which the parties agreed to extend to March 27, 2014.  As of the filing of this Complaint, the Ship is approximately 23% complete by weight, and has been left idle on the slipway at BAE's shipyard in Mobile, Alabama since September of 2013, when BAE unilaterally suspended all work on the

construction of the Ship without any contractual or legal justification.  The incomplete ship and parts are deteriorating, warranty periods for parts installed and/or shipped to the yard continue to run, and WMI is without the Ship for which it contracted.

3.      Due to BAE's failure to exercise due diligence in the performance of the Contract work--which is evidenced most profoundly by its unilateral and unjustified decision to cease all work on the Ship since September 2013--WMI has invoked its right under Article X of the Contract to have the Ship transferred to another shipyard for completion, and has formally notified BAE of this decision.  Notwithstanding WMI's clear contractual right to do so, and BAE's express obligation to "cooperate in good faith … to allow such transfer as promptly and efficiently as possible," *see* Contract § 10.02, BAE has refused to cooperate.

4.      Instead, BAE has denied WMI's right to have the Ship transferred to another shipyard for completion and has further denied WMI access to the shipyard to inspect the Ship or begin the transfer process.  BAE has further asserted that it is terminating the Contract pursuant to Section 11.02(c), a provision under which it claims it has assumed all property rights to the Ship and all materials, parts or equipment not yet utilized in the construction of the Ship, and has reserved its alleged right to sell the partially completed Ship and all parts and equipment at public auction or private sale.

5.      BAE has cited as its reason for refusing to cooperate the fact that WMI and BAE have various disputes regarding the parties' performance of the Contract, including regarding change order requests ("CORs"), design issues and the method of handling of disputed CORs.  In accordance with the Contract, BAE has commenced an arbitration venued in New Orleans, Louisiana (the "Arbitration") to adjudicate these disputes.  The Contract calls for such disputes to be resolved by a panel of three arbitrators, who are required to have specialized expertise in

commercial shipbuilding and repair in the United States.  The Arbitration panel has not been compiled as of the filing of this action.  WMI does not know when the three arbitrators will be in place, but estimates that they will not be in place for at least another month, and likely longer. Accordingly, no arbitration panel is available to consider WMI's need and demand for immediate injunctive relief.

6.     WMI anticipates that the parties' financial and other contractual disputes will be resolved through the arbitration, in due course.  WMI has filed this complaint in aid of arbitration for the limited purpose of obtaining injunctive relief to prevent BAE from acting upon its threat to sell the Ship, materials, parts, and equipment; to prevent BAE from unreasonably allowing the Ship, materials, parts, and equipment to deteriorate, to require BAE to take reasonable commercial steps to maintain them in good condition; to prevent BAE from denying WMI, its vendors, and prospective shipyards who may complete the Ship access to the Ship, materials, parts, and equipment for the purposes of inspecting and evaluating them; and to require BAE to comply with its clear obligation under section 10.02 of the Contract to cooperate in good faith with WMI to allow WMI to transfer the Ship to another shipyard for completion.

7.     Therefore, WMI seeks the Court's intervention to enter an order for those limited purposes.

**THE PARTIES**

8.     WMI is a corporation organized under the laws of the State of New Jersey with its principal place of business at 4 Commerce Drive, Cranford, New Jersey 07016.  WMI also has an office at 304 Gaille Drive, Covington, Louisiana 70433, where its dredging operations are headquartered.

9.     Defendant BAE is a corporation organized under the laws of the state of Delaware with its principal place of business at Main Gate, Dunlap Drive, Mobile, Alabama, 36652.

## JURISDICTION AND VENUE

10. Jurisdiction is proper due to the express consent of BAE pursuant to Article XXI of the Contract dated August 5, 2011, attached as Exhibit "A" to Chatry Affidavit.

11. Venue is proper in this district court as the parties agreed in the Contract to irrevocably waive any objection to venue of any proceeding brought in any federal district court, including any claim that any such proceeding has been brought in an inconvenient forum. Venue is also proper in the District Court pursuant to 28 U.S.C. §1391(b)(2).

12. The District Court has subject matter jurisdiction over all counts pursuant to 28 U.S.C. §1332 since the amount in controversy in the present action exceeds the sum or value of seventy five thousand dollars ($75,000), exclusive of interests and costs, and there exists complete diversity of citizenship, as Plaintiff is a citizen of New Jersey, and Defendant is a citizen of Delaware and/or Alabama.

## FACTUAL ALLEGATIONS

13. WMI was founded in 1919. It is a leader in providing marine dredging services throughout the United States and the Gulf of Mexico, particularly with regard to beach nourishment, channel and berth deepening and maintenance, and marine sediment removal.

14. In recent years, the demand for dredging services has increased dramatically. To help meet that demand, in 2010 WMI decided to commission the construction of a new, state of the art dredge, specially a self-propelled trailing suction hopper dredge (as defined above, the "Ship"). WMI solicited bids for the construction of the Ship. Upon completion, the Ship will be 365 feet long, more than double WMI's current hopper dredging capacity (16,500 cubic yards v. 8,000 cubic yards) and will be a leading tool in the beach re-nourishment market, implementing the latest advances in technologies and design.

**BAE's Fixed Price Bid & The Contract**

15.     BAE Systems plc is a multinational defense, security and aerospace company headquartered in the United Kingdom.  In May 2010 BAE Systems plc acquired Atlantic Marine Company, including its shipyard in Mobile, Alabama.  That shipyard came to be part of BAE Systems Southeast Shipyards (defined above as "BAE"), which is a subsidiary of BAE Systems plc.

16.     BAE submitted a firm fixed price bid (the "Bid") for the project on May 16, 2011. In the Bid, BAE acknowledged that it would perform all "functional" engineering in areas not covered in the primary dredge equipment vendor's hardware scope of supply.   The bid Specifications required bidders to qualify their bid if allowances were made or firm pricing was not being offered; in response, BAE represented the fullest confidence that all was covered and that it was able to perform the engineering work for which it would be responsible and to construct the Ship for its firm fixed price offer.

17.     These representations by BAE were incorporated into the Contract as a BAE warranty.  In Section 1.03, "[BAE] warrants that it has, prior to entering into this Contract, diligently examined the Specifications and has satisfied itself that such Specifications are adequate to enable [BAE] to build the [Ship] in accordance with the Specifications for the Contract Price."

18.     The Contract includes payment provisions for possible changes in the Specifications or other Contract work.  In light of BAE's warranty as to the adequacy of the Specifications, the parties expressed their mutual understanding and common intent that BAE would "**deliver the [Ship] on a firm fixed price basis and change orders shall be minimized**

5

**to the maximum extent possible**."  (Ex. "A" to Chatry Affidavit, at Section 5.01) (Emphasis supplied by Contract).

19.     Any changes in the contracted scope of work must either be directed by WMI or required as a result of new regulatory rules pertaining to the Ship after the Bid date.  If lump sum pricing of an essential change directed by WMI or required as a result of changes in the regulatory rules could not be agreed to, then the Contract allows for materials to be charged at BAE's actual aggregate acquisition costs plus 13.75% markup, and labor to be charged at $58 per man hour or $70 per man hour of premium time applied.

20.     BAE was awarded the Contract after it submitted the lowest of three (3) bids to WMI.  During contract negotiations, WMI indicated to BAE that its price was lower than that of the other bidders and requested BAE to re-confirm its pricing.

21.     BAE replied that "Confidence is high that all is covered and that the engineering scope was well defined."  WMI questioned BAE's commitment to deliver the Ship for the agreed firm fixed price and BAE replied that "BAE is going to honor its price and will not nickel-and-dime the customer."

22.     Upon information and belief, at the time of the Bid BAE had no new construction work on its books at this recently-acquired shipyard, and a BAE Director stated that it needed this highly visible project to establish itself in the shipbuilding business.   BAE repeatedly represented that it bid the job with little or no margin in order to establish itself as a viable shipbuilding facility.

23.     Pursuant to the Contract, the Ship was to be completed and delivered to WMI within thirty (30) months of the effective date (August 5, 2011) or by February 5, 2014.

Approved changes to the Contract extended the delivery date to March 27, 2014, as was confirmed in documents executed by both parties.

24.     Section 7.01 of the Contract provides that "time is of the essence in the performance of [BAE's] obligations under the Contract."

**BAE's Failure to Comply with Contract**

25.     BAE fell behind schedule on the project very early.  Indeed, since the advent of construction, BAE employees have admitted and reported in writing to WMI employees that BAE lacked the manpower necessary to complete the project on schedule, and observations of WMI's on-site staff during the project confirmed this deficiency.

26.     Worker effectiveness data on this job, as reported by BAE to WMI, raised significant concerns as to BAE's ability to complete the Ship on time.

27.     Despite repeated assurances from BAE that it was addressing the lack of manpower, there was no indication to WMI that such measures had been successful, or were even implemented.  Severe performance issues associated with BAE's consulting engineer also contributed to BAE's ongoing delay.

**BAE's Inflated Change Order Claims**

28.     BAE submitted numerous change order requests ("CORs") during the performance of the project.  While WMI does not dispute that BAE would be entitled to some level of compensation for a limited number of proposed change orders after the work was performed and invoiced in accordance with the Contract, the majority of the CORs are without merit as the work covered by the CORs is squarely within the Specifications of the Contract.  On information and belief, BAE is attempting to use the change order process to recoup some its losses on the Contract, and also to attempt to excuse its excessive delay in constructing the Ship.

29.     WMI has disputed and continues to dispute both the entitlement and quantum regarding most of the CORs.   Nevertheless, there is no reason or legal justification why the disputes as to change orders should delay the progress of the work, especially as their aggregate cost is relatively small with respect to the entire Contract price and BAE filed its demand for arbitration to resolve these disputes on August 2, 2013.  Most of the disputed CORs are for work that has yet to be performed or invoiced.

30.     Even though it did not agree on the merit of the CORs, WMI engaged in a good faith attempt to resolve some of the CORs with BAE and successfully negotiated several of them with BAE's operations-level employees; WMI then received from BAE a summary stating "final negotiated position" on those CORs.  Subsequent to this agreement, BAE management rejected the successfully negotiated CORs, indicating that they would only accept a lump sum settlement that included all of their CORs.  Further attempts by WMI to settle CORs were rejected by BAE.

**BAE's Failure to Adhere to the Project Schedule**

31.     Even before BAE suspended work in September of 2013, BAE was woefully behind in the project schedule.

32.     For example, in a letter dated June 17, 2013, BAE forwarded a proposed updated project schedule to WMI.  According to BAE's proposed schedule, the delivery of the Ship would not occur until May 21, 2015, fifteen (15) months from the original contract completion date of February 5, 2014.  In a letter dated June 28, 2013, WMI informed BAE that the revised completion date was unacceptable and urged BAE to dedicate the resources necessary to deliver the Ship in accordance with the original schedule, as adjusted for a few legitimate time extensions.  BAE has failed to do so.

33.    The Contract includes liquidated damages in the amount of $25,000 for each working day of delay up to a maximum of 90 days, in no event to exceed $2,250,000.00. Section 3.10.  This limitation on liquidated damages did not alter or negate the aforementioned "time is of the essence" obligation assumed by BAE in performing its obligations under the Contract.

34.    As a result of BAE's failure to comply with the project schedule, BAE quickly became liable for the full liquidated damages sum in the Contract, giving it little financial incentive to commit the manpower and resources to complete the Vessel as promptly as possible.

35.    In September of 2013, BAE unilaterally stopped work on the Ship.  At the time, work was approximately 23% complete, as measured by total ship weight by an independent third party.

36.    As of this filing, WMI has paid $57,932,278 towards the construction of the Ship in accordance with the Contract.  This is approximately 71% of the total amount WMI would be obligated to pay for the completed Ship, if it had been completed by BAE in accordance with the Contract.  Specifically, WMI has paid BAE $25,365,398 of the total of $49,736,074 that the Contract calls for BAE to be paid as the builder's amount pursuant to Section 2.01(a) of the Contract.  These payments were timely made by WMI in accordance with project milestones as set forth in Section 2.04 of the Contract.  WMI has also paid IHC Merwede ("IHC"), a designer and manufacturer of specialized dredging equipment, the sum of $32,566,880 (through BAE) for IHC's scope of engineering services and hardware supply to be installed on the Ship.

37.    In late 2013, BAE relocated the Ship to a new position in its shipyard.  Upon information and belief, this was done for the purpose of allowing BAE to work on other ship(s) which rightfully should come after the Ship in BAE's production schedule.

**WMI Invokes its Contractual Right to Transfer the Work to Another Shipyard**

38.     As a result of BAE's failure to comply with the timing requirements of the Contract and despite repeated attempts to figure out a way to move the project along, WMI eventually was left with no real choice but to hold BAE in default pursuant to the Contract.

39.     Article X, Section 10.01 of the Contract provides the procedure for WMI to place BAE in default for failure to comply with its contractual obligations including, *inter alia*, the failure to use due diligence in the performance of the Contract work.

40.     Specifically, Section 10.01(a) of the Contract provides that the following constitute events of default of the BUILDER [BAE] under the Contract:

> The failure of the BUILDER to use due diligence in the performance of the Contract work or its failure to perform any of the material covenants, agreements, or undertakings on its part to be performed under this Contract; provided that the BUYER [WMI] shall give written notice to the BUILDER as such failure, and the BUILDER does not, within 38 days after being so notified, correct any failure to use due diligence or undertake the performance to correct such failure, and thereafter prosecute in good faith to completion all such work or performance required to correct such failure within 90 days of such notice.

41.     Section 10.02 of the Contract provides for actions WMI may take in the event of BAE's default.  Specifically, Section 10.02 provides that "[i]n the event that any one or more of the events of default specified in Section 1 of Article X of this Contract shall have occurred, the BUYER, if it so elects, <u>may proceed to have the work on the [SHIP] transferred to and completed at another shipyard.</u>  The BUILDER shall cooperate in good faith with the BUYER to allow such transfer as promptly and efficiently as possible."  (emphasis added).

42.     Section 10.02 further provides that if WMI elects to transfer the Ship to another shipyard, BAE shall: "(i) assign such subcontracts and orders for material, services and supplies to be used in the performance of said Contract work to the BUYER as the BUYER may direct."

43.     Pursuant to Section 10.01 of the Contract, WMI provided BAE with written notice of default on June 28, 2013, September 11, 2013, and, most recently, on February 26, 2014.  Despite being provided with written notice of its numerous defaults, and despite WMI's repeated, diligent, and good faith efforts to work with BAE to solve the problem, BAE has failed to correct these defaults or undertake the performance required to remedy said defaults. (Attached as Exhibit "M" to the Chatry Affidavit is a true and correct copy of the February 26, 2014 letter).

44.     The Contract gave BAE up to 38 days to cure a default after being notified of it. BAE failed to cure its default in a timely manner.

45.     As a result, on April 7, 2014 WMI notified BAE that WMI was invoking its right to have the work on the Ship transferred to and completed at another shipyard.  (Attached as Exhibit "N" to the Chatry Affidavit is a true and correct copy of the April 7, 2014 letter from WMI to BAE.).

**WMI's Attempt to Locate to Another Shipyard to Complete Work on the Ship**

46.     WMI has been in contact with other shipyards in an attempt to locate one that can receive the Ship to complete the work that was required to be done under the Contract, and more particularly to identify the yard that can complete the project most effectively and efficiently.

47.     One shipyard, Eastern Shipbuilding Group, Inc., has informed WMI that it currently has the capacity to receive the Ship and is interested in contracting with WMI to complete the construction. Because capacity at this and other shipyards is limited—particularly to receive ships as large as the Ship—it is unclear for how long Eastern Shipbuilding Group will continue have the capacity to receive the Ship, and the risk that it will not, increases as each day passes. (See Affidavit of Brian R. D'Isernia, attached hereto as Exhibit 2).

48.     On April 8, 2014, Bernardus Blomberg, an engineer employed by WMI sent BAE an email saying that he would be visiting BAE's shipyard in Mobile, Alabama on April 10, 2014 to inspect the Ship and its equipment and to begin preparation to transfer it.  WMI needs to inspect the Ship to evaluate its condition and prepare for its transfer to another shipyard, and representatives from other shipyards need to inspect the Ship in order to decide whether or not to agree to complete the work and how to price it. (Attached as Exhibit "A" to the Affidavit of Barnardus J. Blomberg, attached hereto as Exhibit 3, is a true and correct copy of the April 8, 2014 email.).

**BAE's Refusal to Cooperate to Allow the Transfer of the Ship**

49.     BAE has refused in all respects to comply with WMI's request to transfer the Ship pursuant to Section 10.02 of the Contract.  Instead, on April 9, 2014, BAE denied that WMI has the right to have the Ship transferred to another shipyard for completion and stated that it was terminating the Contract pursuant to Section 11.02(c).  BAE claims that, under Section 11.02, it has assumed all property rights to the Ship and all materials, parts or equipment not yet utilized in the construction of the Ship.  BAE further "reserved the right to sell such property at public auction or by private sale."  (Attached as Exhibit "O" to the Chatry Affidavit is a true and correct copy of the April 9, 2014 letter from BAE to WMI.).

50.     When Mr. Blomberg arrived at BAE's shipyard on April 10, 2014 to inspect the Ship, he was denied access.

51.     Accordingly, WMI commenced the instant action seeking the Court's intervention.

## COUNT I
## BREACH OF CONTRACT

52.     Paragraphs 1 through 51 are incorporated by reference as if set forth fully herein.

53.     Pursuant to Section 10.01 of the Contract, WMI had the right to declare BAE in default of its obligations under the Contract, including, *inter alia*, for BAE's failure to exercise due diligence in the performance of the Contract work and to perform any of the material covenants, agreements, or undertakings on its part to be performed under this Contract.

54.     As a result of BAE's various failures to comply with the Contract outlined above, WMI provided BAE with written notice of default on June 28, 2013, September 11, 2013, and, most recently, on February 26, 2014 pursuant to Section 10.01.   BAE failed to cure its deficiencies and undertake the performance of the Contract within the cure periods provided in Section 10.01.

55.     As a result of BAE's defaults, WMI notified BAE on April 7, 2014 that the time period provided by the Contract for BAE to cure its defaults had expired, and WMI elected to transfer the work on the Ship pursuant to Section 10.02 of the Contract.

56.     Section 10.02 requires BAE to, *inter alia*, "cooperate in good faith with [WMI] to allow such transfer as promptly and efficiently as possible."

57.     BAE has breached the Contract based upon its failure to cooperate in good faith to allow for the transfer of the Ship in compliance with the terms of Section 10.02.

58.     BAE's ongoing breach of the Contract threatens immediate and irreparable harm to WMI because of the deterioration of the Vessel, its parts and equipment, the lapsing of vital manufacturers' warranties for equipment and machinery previously paid for by WMI and to be installed in the Vessel, and the risk of losing the availability of another shipyard to complete the Vessel in the foreseeable future.

59.     WMI has no adequate remedy at law, and will continue to suffer substantial and immediate irreparable harm unless BAE is enjoined as requested below.

60.     Greater injury will be inflicted on WMI by the denial of the relief requested herein than will be inflicted on BAE by the granting of this relief.

## COUNT II
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

61.     Paragraphs 1 through 60 are incorporated by reference as if set forth fully herein.

62.     The implied covenant of good faith and fair dealing inherent in the Contract required BAE to exercise the utmost good faith and to deal fairly with WMI in the construction of the Ship.

63.     BAE has deprived WMI of the benefit of its bargain by the wrongful actions outlined in the Complaint, including but not limited to, failing to comply with the construction schedule, refusing to transfer the Ship as required by the Contract, and denying WMI access to the shipyard to inspect the Ship.  Such actions have significantly impaired WMI's ability to obtain the benefits of the Contract, and BAE has breached the implied covenant of good faith and fair dealing.

64.     As a consequence, WMI has suffered and will continue to suffer irreparable harm and loss.

## COUNT III
## UNJUST ENRICHMENT

65.     Paragraphs 1 through 64 are incorporated by reference as if set forth fully herein.

66.     WMI has expended substantial money to BAE in connection with the construction of the Ship.

67.     By, among other things, threatening to sell the partially completed Ship at public auction or private sale, improperly exercising dominion and control over the Ship, materials,

parts, and equipment, refusing to transfer them, and refusing to permit access to them by WMI, BAE has wrongfully received and retained assets and property that rightfully belong to WMI.

68.     BAE has received and retained these assets and property at the expense of WMI.

69.     It is against equity and good conscience for BAE to be permitted to retain these assets and property.

70.     This unjust enrichment has caused and will continue to cause irreparable harm to WMI.

**COUNT IV**<br>**CONVERSION**

71.     Paragraphs 1 through 70 are incorporated by reference as if set forth fully herein.

72.     BAE currently exercises complete dominion and control over the Ship, materials, parts, and equipment.

73.     BAE has interfered with WMI's right of possession of the Ship, materials, parts, and equipment by, among other things, denying WMI's right to have them transferred to another shipyard and intentionally refusing WMI access to them.

74.     BAE's exercise of dominion and control over the Ship, materials, parts, and equipment is unauthorized and in direct violation of the Contract and WMI's right to possession and inspection of the Ship.

75.     As a consequence, WMI has suffered and will continue to suffer irreparable harm and loss.

WHEREFORE, WMI requests the following relief:

Temporary, preliminarily and permanent injunctive relief: prohibiting BAE from selling the Ship or any of the materials, parts or equipment associated with the Ship; prohibiting BAE from unreasonably allowing the Ship and its parts to deteriorate, and requiring BAE to take

reasonable commercial steps to maintain the Ship in good condition; prohibiting BAE from denying WMI, its vendors, and other shipyard representatives from accessing the Ship during regular business hours for the purposes of inspecting and evaluating the Ship, and to prepare to transfer it; and requiring BAE to cooperate in good faith with WMI to allow the transfer of the Ship and all of the materials, parts and equipment associated with the Ship as promptly and efficiently as possible;

Award WMI such other and additional relief as the Court may deem just and proper, including, but not limited to, attorneys' fees, litigation costs and punitive damages.

Dated:  April 21, 2014

   /s/ Henry A. King             
Henry A. King (La Bar No. 7393)
Timothy S. Madden (La Bar No. 21733)
Michael J. Cerniglia (La Bar No. 29792)
**KING KREBS & JURGENS, PLLC**
201 St. Charles Ave.
45th Floor
New Orleans, LA 70170
Tel: (504) 582-3805
Fax: (504) 582-1233

Michael R. Griffinger
Thomas R. Valen
Scott J. Etish
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey  07102-5310
Tel: (973) 596-4701
Fax: (973) 639-6294
*Pro Hac Vice Application to be filed*

*Attorneys for Plaintiff Weeks Marine, Inc.*